**UNITED STATES of America, Appellee,**

v.

**Jack L. MARVIN, Appellant.**

**No. 81–2255.**

United States Court of Appeals, Eighth Circuit.

Submitted April 15, 1982.

Decided Sept. 3, 1982.

Rehearing Denied Oct. 14, 1982.

---

Robert G. Ulrich, U. S. Atty., W. D. Mo., Richard J. Marien, Atty., U. S. Dept. of Justice, Kansas City, Mo., for appellee.

James R. Wyrsch, Charles E. Atwell, Kansas City, Mo., for appellant.

Before McMILLIAN, Circuit Judge, STE-PHENSON, Senior Circuit Judge, and AR-NOLD, Circuit Judge.

ARNOLD, Circuit Judge.

Defendant Jack L. Marvin was convicted of three food-stamp offenses: one count of unlawfully acquiring and possessing United States Department of Agriculture food-stamp coupons in violation of 7 U.S.C. § 2024(b), and two counts of aiding and abetting one Anthony R. Astorino in violat-

ing the same statute.[1] The District Court[2] sentenced Marvin to one year's imprisonment, with all but 90 days suspended, plus two years' probation to follow the 90 days of incarceration. This portion of the sentence was imposed concurrently on all three counts. In addition, a fine of $5,000 was imposed on Count I.

■ The principal question presented is what state of mind a person must have in order to be guilty of violating 7 U.S.C. § 2024(b). The Government contends, and the District Court held, that if a defendant knows that what he has acquired or is possessing is food stamps, and if the acquisition or possession is not authorized by law, a crime has been committed, even if the defendant is unaware that his acquisition or possession is unauthorized. Defendant argues, on the other hand, that the District Court should have instructed the jury that it could not convict him of the substantive offense unless it found that he knew he was violating the law. We agree and reverse the conviction on Count I. We affirm as to the two aiding-and-abetting counts, however, because as to them a proper instruction was given. The sentence imposed therefore remains intact, except for the $5,000 fine on Count I.

## I.

Prior to his conviction, Marvin had been a practicing chiropractor for approximately 25 years, primarily in Kansas City, Missouri. As part of its crackdown on food-stamp fraud in the Kansas City area, the United States Department of Agriculture enlisted the aid of Jackie Clark in some of its investigations.[3] Clark knew Dr. Marvin, who had treated several members of Clark's family for a number of years. Working as an investigative aide for the government,

Clark had assisted in about 42 cases concerning food-stamp fraud and abuse involving more than 60 individuals.

The basic procedure used by the government in its investigations consisted of supplying Jackie Clark with various amounts of food stamps (usually from $500 to $1,000) and then allowing Clark to solicit buyers of the stamps or coupons at less than their face value. Defendant Marvin was allegedly involved on at least four occasions when such illegal transactions occurred. In the first of these transactions, dated March 10, 1980, Clark was given $500 in food stamps by investigators from the Agriculture Department. He entered defendant's chiropractic clinic and later returned to the federal agents with $200 in cash. This transaction was the subject of Count I and the only one in which Marvin allegedly purchased the food stamps directly from Clark.

Other transactions occurred on April 9, 1980, May 22, 1980, and July 14, 1980, in which Marvin allegedly acted as an aider and abettor by either arranging the transactions or providing the necessary money for the purchases of the food coupons. The purchases on these dates constituted the substance of Counts II, III, and IV, respectively. Investigating agents conducted audio or video surveillance of the April 9 and May 22 transactions and also of a purchase of coupons on August 6, 1980, which was not the subject of any counts of the indictment. Much of the government's evidence, however, depended on the testimony of investigative aide Jackie Clark and, to a lesser degree, on that of several federal agents who supervised Clark's actions.

On appeal, defendant Marvin raises a number of issues as grounds for reversal of his convictions. He contends that the Dis-

---

1. The counts will be referred to in this opinion by the numbers used at trial, Counts I, II, and III. Count I is the substantive offense, and Counts II and III charge aiding and abetting. Defendant was acquitted of a third aiding-and-abetting count, Count IV, charging conduct on a later date. In the indictment as originally returned defendant was charged in Counts I, II, IV, and V. Defendant's trial was severed from that of two co-defendants, and the counts naming him were renumbered I, II, III, and IV, respectively.

2. The Hon. Russell G. Clark, Chief Judge, United States District Court for the Western District of Missouri.

3. Clark had been referred to federal officials, including agents of the Organized Crime and Racketeering Section, United States Department of Justice, by officials in the Kansas City, Missouri, Police Department.

trict Court erred in the following respects: (1) refusing to instruct the jury on the issue of specific intent as a requirement for a violation of 7 U.S.C. § 2024(b); (2) denying Marvin's motion to dismiss the indictment because it was not sufficiently specific and rejecting his argument that the statute is unconstitutionally vague on its face and as applied; (3) admitting evidence of a food-stamp transaction occurring on August 6, 1980; (4) admitting into evidence portions of tape-recorded conversations of April 9, 1980, and May 22, 1980; (5) limiting Marvin's cross-examination of Jackie Clark; (6) overruling defendant's objections to the prosecutor's closing argument; (7) denying his motions for acquittal; and (8) denying defendant's motion to dismiss based upon alleged improper government conduct in violation of the Due Process Clause of the Fifth Amendment.

## II.

Section 2024(b) of Title 7 of the United States Code, in pertinent part, provides:

[W]hoever knowingly uses, transfers, acquires . . . or possesses [food] coupons . . . in any manner not authorized by this chapter or the regulations issued pursuant to this chapter shall, if such coupons are of a value of $100 or more, be guilty of a felony . . . .

Defendant Marvin argues that the language of the statute, reflected in the indictment,[4] required a jury instruction on

specific intent. The District Court refused to give such an instruction proposed by the defendant and, instead, submitted to the jury an instruction offered by the government that did not require Marvin to possess the specific intent to violate the statute.[5] Defendant contends that this was error and that the word "knowingly" in § 2024(b) required the government to prove that he knew that his actions were in violation of the law. We must agree.

In *United States v. Marshall*, 683 F.2d 1212 (8th Cir. 1982), in the course of affirming convictions under both 7 U.S.C. § 2024(b) and 7 U.S.C. § 2024(c), we remarked that "knowledge that the food stamps in question had been acquired in a manner not authorized by the Act . . . is an element of both offenses." At 1214. In that case, however, both sides agreed that knowledge of unlawful acquisition had to be proved by the government. The District Court had so instructed the jury. The issue in this Court was whether certain evidence said by the government to be relevant on the issue of knowledge had been properly admitted. The statement in the *Marshall* opinion, therefore, though certainly not inadvertently made, is, strictly speaking, only dictum. We approach the issue anew, therefore, free of the compulsion of any binding authority. Neither side has cited an appellate opinion directly in point, and we have found none.

---

**4.** Count I of the indictment states, in relevant part, that "Jack L. Marvin did knowingly acquire and possess United States Department of Agriculture food stamp coupons . . . in a manner not authorized by the provisions of Chapter 51, Title 7, United States Code and the regulations issued pursuant to said chapter . . . ." D.R. 8.

**5.** The District Court submitted the following instruction to the jury:

The defendant, Jack L. Marvin, is charged in Counts I, II, III, and IV of violations of 7 U.S.C. Section 2024(b), which provides in pertinent part:

Whoever knowingly uses, transfers, acquires, . . . or possesses coupons . . . in any manner not authorized by this Chapter or the regulations issued pursuant to this Chapter shall, if such coupons are the value of $100 or more

. . . be guilty of an offense against the laws of the United States. [sic]

Four essential elements are required to be proved in order to establish the offense charged in the indictment.

First: the act of acquiring or possessing the food stamp coupons.

Second: the value of the food stamp coupons equaled or exceeded $100.

Third: At the time the food stamp coupons were acquired or possessed, the defendant was not authorized to acquire or possess food stamp coupons in the manner acquired.

Fourth: the act was done knowingly.

An act is done "knowingly" if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

The purpose of adding the word "knowingly" is to insure that no one will be convicted for an act done because of mistake, or accident or other innocent reason. Tr. 449–50.

■ The government argues that purchase of food stamps is only a *malum prohibitum*, a crime unknown to the common law, a so-called "regulatory offense," as to which no *mens rea* need be shown. Certainly there are such offenses. Congress may make an act criminal without regard to the actor's state of mind, subject of course to the Constitution. The question before us is simply one of statutory construction, whether Congress in 7 U.S.C. § 2024(b) has chosen to exercise its power to disregard the maxim, *Actus non facit reum, nisi mens sit rea.* "[C]ourts obviously must follow Congress' intent as to the required level of mental culpability for any particular offense." *United States v. Bailey*, 444 U.S. 394, 406, 100 S.Ct. 624, 632, 62 L.Ed.2d 575 (1980). In considering this question we are mindful that the crime involved is a felony, punishable by imprisonment in a federal penitentiary for up to five years. The normal purpose of the criminal law is to condemn and punish conduct that society regards as immoral. Usually the stigma of criminal conviction is not visited upon citizens who are not morally to blame because they did not know they were doing wrong. If Congress wishes to depart from that norm, it may do so, but in general it must manifest its intention by "affirmative instruction." *Morissette v. United States*, 342 U.S. 246, 273, 72 S.Ct. 240, 255, 96 L.Ed. 288 (1952). It may require less evidence to convince a court that such an "affirmative instruction" has been given when the crime involved is a "regulatory offense" with no common-law analogue. But the fact remains that we should not attribute to Congress the intention to make a felony out of a morally innocent act, unless Congress has clearly announced its desire to do so.

We begin as always with the words of the statute, quoted above. The government stresses that the adverb "knowingly" imme-diately precedes the verbs "uses, transfers, acquires," etc., and is some distance away from the crucial clause, "in any manner not authorized by this chapter." It contrasts the language of § 2024(c)[6] in order to show that Congress knew how to place the word "knowingly" in such a way as to require unambiguously that a person know he is acting contrary to law. Violation of § 2024(c), the argument runs, requires specific intent,[7] but violation of § 2024(b) does not. We disagree. The different placement of the words "knowingly" and "knowing" in the two subsections of the statute is too weak a reed to support the argument that Congress intended to displace a time-honored principle of criminal jurisprudence. For one thing, purely as a verbal matter, the word "knowingly" in subsection (b) may naturally be read to modify the entire remainder of the clause in which it appears, including the phrase, "in any manner not authorized," etc. To read "knowingly" as having nothing to do with the phrase, "in any manner not authorized," is, we suppose, verbally tenable, but it is not the only meaning the words will bear, nor even, we think, the more natural one. Furthermore, the government's reading of the statute would make it easier to convict an ordinary citizen, like Dr. Marvin, for buying food stamps, than someone in the grocery business who would have some reason to be familiar with the regulations governing redemption of stamps for cash in an authorized fashion. The latter kind of person is the class to whom subsection (c) is directed. It is not apparent to us how that kind of distinction in the necessary elements of the two crimes would serve the purpose of Congress. In sum, though the reading of the statute suggested by the government is a verbally possible one, the statute is at most ambiguous. It does not amount to a clear statement that Congress wished to condemn a morally innocent act.

**6.** 7 U.S.C. § 2024(c) provides in relevant part:
Whoever presents, or causes to be presented, coupons for payment or redemption of the value of $100 or more, knowing the same to have been received, transferred, or used in any manner in violation of the provisions of this chapter or the regulations issued pursu-

ant to this chapter, shall be guilty of a felony
. . . .

**7.** And we have so held, in *United States v. Miller*, 543 F.2d 1221, 1223 (8th Cir. 1976), *cert. denied*, 429 U.S. 1108, 97 S.Ct. 1142, 51 L.Ed.2d 561 (1977).

In some cases legislative history might be clear enough to resolve this sort of ambiguity in the government's favor, but that is not so here. Although the legislative history of § 2024(b) is far from extensive, there is sufficient evidence to suggest that Congress desired that no one be convicted of violating this section without proof that he knew the unlawful character of his act. A 1977 House Committee Report describing the then-current rules and practice on penalties and sanctions under the Food Stamp Act of 1964, as amended, 7 U.S.C. §§ 2011 et seq., states:

> The Food Stamp Act of 1964, as amended and as implemented by Federal rules, provides for three groups of offenders and penalties, the first for recipients (and other persons) *who knowingly use, transfer, acquire, alter, or possess food stamps or authorization to purchase documents illegally, or who use food stamps knowing that they have been used illegally*; the second for retail food stores, wholesale food concerns, and meal services that violate rules governing the use and redemption of food stamps; and the third for state agencies that do not comply with program rules or administer the program in a manner deemed to be grossly negligent or fraudulent.

H.R.Rep.No. 95–464, 95th Cong., 1st Sess. 376 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 1704, 1978, 2305 (emphasis ours). The underscored language corresponds to § 2024(b), and when pared to its essence, the meaning is clear: The Food Stamp Act provides for a particular group of offenders "who knowingly ... acquire ... or possess food stamps ... illegally." Knowledge of the illegal nature of the transaction is, therefore, necessary for an individual to be subject to sanctions under the Act. Although the House Report described the state of the law prior to the enactment of the statute in its present form, the enacted statute did not make any significant changes in the language of the earlier provision.[8]

■ The District Court correctly stated in its instructions that the purpose of in-

cluding the word "knowingly" in § 2024(b) is "to insure that no one will be convicted for an act done because of mistake, or accident or other innocent reason." Limiting the word, however, to an interpretation that requires only knowledge that the items a person acquires or possesses are food-stamp coupons, effectively defeats that purpose. Under this view, a person who possesses food stamps in safekeeping for another or even in exchange for an item of clothing or for personal assistance would be subject to sanctions as long as he knew that the articles he had acquired were food stamps. We think that such was not the intent of Congress. The penalty provisions in the Food Stamp Act were added to reduce fraud and abuse in the food-stamp program. See H.R.Rep.No. 95–464, 95th Cong., 2d Sess. 2, 3 (1977), *reprinted in* 1977 U.S.Code Cong. & Ad.News 1978, 1979. To require a lesser degree of intent would widen the net to include those who had no conscious desire to commit fraud nor even suspected that they might have done so. As stated in *Morissette v. United States, supra,* 342 U.S. at 263, 72 S.Ct. at 249, "[t]he purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction, to strip the defendant of such benefit as he derived at common law from innocence of evil purpose, and to circumscribe the freedom heretofore allowed juries." Though § 2024(b) has no common-law origin, it seems clear that Congress, in this instance, did not intend to create what would be for all practical purposes a strict-liability crime. See *United States v. Chicago Express, Inc.,* 235 F.2d 785, 786 (7th Cir. 1956).

We hold that the defendant's requested instruction no. 13, based on Devitt & Blackmar, *Federal Jury Practice and Instructions* § 14:03 (3d ed. 1977), should have been given. The jury should have been told that the government had to prove "that the defendant knowingly did an act which the law forbids." D.R. 146 (the text of the refused instruction). This does not mean that the defendant must know, by chapter and verse, the precise law and regulation that forbid trafficking in food stamps for cash.

---

**8.** Food and Agriculture Act of 1977, Pub.L.No. 95–113, § 1301, 91 Stat. 913, 975.

But he must know that he was acting in violation of *some* law or regulation. Such a requirement places no unreasonable obstacle in the path of food-stamp prosecutions. Intent may often be inferred from circumstances, including, for example, purchases of stamps at a deep discount. Nor do we hold that the evidence here was insufficient to show the requisite intent. The fact remains, however, that under the instructions given the jury was permitted to convict, and could have done so, without finding that when defendant bought food stamps on the occasion charged in Count I, he knew he was doing something that the law had forbidden. The conviction on Count I must therefore be reversed.

■ The same result does not follow, however, as to Counts II and III. Although those counts refer both to the substantive offense and to 18 U.S.C. § 2, the aiding-and-abetting statute, it is clear in context that Marvin was not charged in these two counts with acquiring or possessing food stamps himself, but rather with helping someone else *to do so.* And the District Court instructed the jury that the defendant could not be convicted of aiding and abetting unless he acted "willfully," "and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law." Tr. 452, 453. There was ample evidence to support a guilty verdict on Counts II and III under these instructions, which were clearly correct.

### III.

■■ We next consider Marvin's contentions that the indictment did not state an offense and that § 2024(b) is unconstitutionally vague. Both of these issues can be disposed of easily after our conclusion that the language of the statute required an instruction on specific intent. The indictment, phrased in the words of the statute, is sufficient because, as we determined, the words of themselves "set forth all the elements necessary to constitute the offense intended to be punished . . . ." *United States v. Carll,* 105 U.S. 611, 612, 26 L.Ed. 1135 (1881) (quoted in *Goodloe v. Parratt,* 605 F.2d 1041, 1045 (8th Cir. 1979)). Mar-

vin's challenge to the constitutionality of § 2024(b) on vagueness grounds also fails because of our narrow construction of the statute, if for no other reason. In addition, *United States v. Goyette,* 458 F.2d 992 (9th Cir. 1972), upheld the constitutionality of the predecessor to § 2024(b). The minor differences in language between the two statutes are of no significance here.

Marvin raises a number of other issues which we briefly examine.

■ Defendant claims that the District Court abused its discretion in admitting into evidence the events of August 6, 1980. He testified at trial that he was not involved in the food-stamp transaction that occurred on that date. The evidence on the August 6 transaction consisted of the testimony of Jackie Clark, government agent Thorn, and defendant Marvin, and the government's videotape. Marvin was apparently the only person in a position to witness firsthand all the events of August 6, and the videotape did not record much of the transaction and was vague and ambiguous. We are nevertheless convinced that the court did not abuse its discretion in admitting the evidence as probative of the defendant's "knowledgeable participation" in the food-stamp purchases and as establishing a link between Marvin and his codefendants. See generally *United States v. Adcock,* 558 F.2d 397, 401–02 (8th Cir.), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). The District Court permissibly found that the probative value of the evidence was not "substantially outweighed by the danger of unfair prejudice . . . ." Fed.R.Evid. 403. See generally *United States v. Maestas,* 554 F.2d 834, 836 (8th Cir.), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977).

■ Marvin next argues that the District Court should not have allowed into evidence portions of tape-recorded conversations of April 9, 1980, and May 22, 1980, because there was an insufficient showing of a criminal conspiracy. This argument lacks merit. There was substantial independent evidence indicating Marvin's extensive involvement in the conduct of co-defendant Anthony Astorino. The preponder-

ance-of-the-evidence standard was clearly met to establish defendant's complicity in a conspiracy for the purpose of admissibility. See *United States v. Bell*, 573 F.2d 1040, 1043–44 (8th Cir. 1978).

 Defendant alleges that the District Court improperly limited his cross-examination of the government's informant, Jackie Clark. He contends that he was not able to place before the jury (1) evidence of robberies and thefts Clark had committed prior to his employment with the government, (2) the fact that Clark had been treated at a mental hospital, and (3) that John Eikel, a Missouri police officer, had filed a million-dollar lawsuit against Western Union concerning Clark. Clark, however, had never been charged with or convicted of any of the crimes allegedly committed prior to his work with the government. Also, his treatment for drug and alcohol addiction at the mental hospital had been voluntary, lasting only three days, and the lawsuit filed by the police officer did not name Clark as a defendant. On the other hand, Marvin was given ample opportunity to show the unsavoriness of Clark's character. He was permitted to cross-examine Clark on his three felony convictions, his drug use, and his reputation in the community. Several witnesses also testified as to Clark's alleged drug use, involvement in various crimes, and his propensity to lie. The District Court did not abuse its discretion in excluding the proffered evidence. See *United States v. Bernhardt*, 642 F.2d 251, 253 (8th Cir. 1981); *United States v. Peltier*, 585 F.2d 314, 332 (8th Cir. 1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979).

 Marvin next contends that it was error for the District Court to admit into evidence the tape-recorded conversations of April 9, 1980, and May 22, 1980, without a proper foundation. In *United States v. McMillan*, 508 F.2d 101, 104 (8th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975), we set forth the following requirements for the introduction of such evidence:

(1) That the recording device was capable of taking the conversation now offered in evidence.

(2) That the operator of the device was competent to operate the device.

(3) That the recording is authentic and correct.

(4) That changes, additions or deletions have not been made in the recording.

(5) That the recording has been preserved in a manner that is shown to the court.

(6) That the speakers are identified.

(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

Defendant asserts that only requirements (5) and (6) were met in this case. The District Court specifically addressed this argument in its order of October 29, 1981, ruling on Marvin's motion for a new trial. Based on our review of the evidence in the record, we conclude that the court did not abuse its discretion in admitting the taped conversations.

 Defendant alleges error in the District Court's overruling of his objection to certain statements made by the prosecutor during opening and closing arguments that, in effect, expressed the opinion that Marvin was lying.[9] The government argues that the comments of its counsel during closing argument were meant to reassure the jury that the prosecutor was offering no person-

---

9. During the course of his opening argument, the prosecutor stated: "Defendant is telling you a story, ladies and gentlemen, that doesn't fit the facts ... the government submits to you that the defendant is lying to you ...." Tr. 430.

In his closing argument, apparently in response to that of defense counsel, the prosecutor remarked:

[L]et me mention at the outset, as [defense counsel] so vehemently responded, I'm not here in my personal capacity, .... I'm here representing the United States government and the belief of the government of what the evidence shows and the government believes that the evidence shows that the actions and the conduct of the defendant occurred as we put the evidence on, and the only result that you can reach in light of the defendant's testimony here in court to you is that he's wrong, whether you call it a lie or an error or mistaken, but he's wrong. It didn't occur the way he said it did.

Tr. 431.

al opinion on the evidence despite suggestions to the contrary in defense counsel's closing arguments.[10] It is true that "the prosecutor has no authority to sit as a 'thirteenth juror'" and state a personal opinion on the defendant's guilt or innocence. *United States v. Splain*, 545 F.2d 1131, 1134 (8th Cir. 1976). Here, however, the prosecutor was primarily commenting on the defendant's testimony, and most of what was stated was "within the permissible degree of latitude afforded the prosecutor in responding to the argument of defense counsel." *Ibid.* Where there is substantial evidence of guilt, such remarks do not usually constitute reversible error. *Ibid.*

Finally, Marvin contends that the District Court erred in denying his motions for acquittal and in overruling his motion to dismiss based on the alleged improper conduct of the government. Both arguments are without merit. There was substantial evidence to support the jury's verdict, taking the view most favorable to the government. See *United States v. Lambros*, 564 F.2d 26, 28 (8th Cir. 1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978). And the evidence in the record does not indicate any conduct on the part of the government that was so outrageous as to violate the Due Process Clause. See, *e.g., Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Quinn*, 543 F.2d 640 (8th Cir. 1976).

#### IV.

The judgment as to Count I is reversed. As to Counts II and III, the judgment is affirmed. The sentence imposed by the District Court, except for the fine of $5,000 on Count I, remains undisturbed.

It is so ordered.

10. During closing argument, defense counsel made the following comments:

Am I going to judge this case by the statements of [prosecutor] who will stand up here and tell you that a fellow who's been a family doctor for 25 years is a liar . . . .

When you hear him try to call Dr. Marvin a liar again, you ask him how come you put Jack Clark on the stand to lie. How come he lied to us, [prosecutor]. Do you want us to convict a man four times on a perjurer's testimony?

\* \* \* \* \* \*

. . . Dr. Marvin, he gets on the stand, he gets called a liar. That's the way he gets treated in this court, but that's all right according to the government.

Transcript of Defendant's closing argument, pp. 3–6.